UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| FCE BENEFIT ADMINISTRATORS, INC., § <br> § <br> Plaintiff, § <br> § <br> v. § <br> § <br> INDEPENDENCE HOLDING COMPANY, § <br> § <br> MADISON NATIONAL LIFE § <br> INSURANCE COMPANY, INC., § <br> § <br> STANDARD SECURITY LIFE § <br> INSURANCE COMPANY OF NEW § <br> YORK, and § <br> § <br> IHC CARRIER SOLUTIONS, INC. § <br> § <br> § <br> Defendants. § | CIVIL ACTION NO.: 3:17-CV-01321-K |

**FCE BENEFIT ADMINISTRATORS, INC.'S FIRST AMENDED COMPLAINT**

**I.**

**PARTIES**

1.      Plaintiff, FCE Benefit Administrators, Inc. ("Plaintiff" or "FCE"), is a California corporation, with its principal place of business located in San Mateo, California, and its operations center located in San Antonio, Texas. FCE is a Third Party Administrator ("TPA") that enters into contracts in the course and scope of its business with various insurance providers, including the defendants in this action, for the provision of fringe benefit plans to its various clients, including for-profit and not-for-profit government contractors.

2.      Defendant, Madison National Life Insurance Company, Inc. ("MNL"), is a Wisconsin corporation, with its principal place of business located in Madison, Wisconsin. FCE is informed and believes, and based thereon alleges that MNL does not maintain a regular place

of business or an agent for service of process within the State of Texas, and therefore may be served with process through the Texas Secretary of State pursuant to Texas Civil Practice and Remedies Code section 17.044. MNL is a licensed insurance carrier that offers various insurance products, including group life, health insurance and disability income products.

3. Defendant, Standard Security Life Insurance Company of New York ("SSL"), is a New York Corporation, with its principal place of business in New York, New York. FCE is informed and believes, and based thereon alleges that SSL does not maintain a regular place of business or an agent for service of process within the State of Texas, and therefore may be served with process through the Texas Secretary of State pursuant to Texas Civil Practice and Remedies Code section 17.044. SSL is a licensed insurance carrier that offers various insurance products, including disability benefits, health insurance, stop-loss insurance and group term-life insurance.

4. Defendant, Independence Holding Company ("IHC"), is a Connecticut corporation, and is an organization of insurance carriers, with its principal place of business located in Stamford, Connecticut. FCE is informed and believes, and based thereon alleges that IHC does not maintain a regular place of business or an agent for service of process within the State of Texas, and therefore may be served with process through the Texas Secretary of State pursuant to Texas Civil Practice and Remedies Code section 17.044. IHC is the parent company of defendants MNL and SSL.

5. Defendant IHC Carrier Solutions, Inc. ("IHC Carrier") is a Delaware Corporation with its principal executive office in Arizona, and its stated mailing address in New York. IHC Carrier may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201. IHC Carrier is a TPA, described by IHC as a program management, actuarial and regulatory compliance firm providing product and business

development, valuation services and business block evaluation for IHC's fully insured health segment. (*See* www.ihcgroup.com/companies.aspx.) (Jointly, MNL, SSL, IHC and IHC Carrier may be referred to as the "Defendants")

## II.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7. Venue is properly based in this district pursuant to paragraph 8(b) of the September 1, 2012 Service Agreement between MNL and FCE (the "MNL Agreement"), which provides that "[a]ny legal suit, action or proceeding arising out of or related to this Agreement will be instituted in the federal courts of the United States of America or the courts of the State of Texas in each case located in Dallas County and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

8. This action arises under the laws of the State of Texas pursuant to paragraph 8(a) of the MNL Agreement, which provides that "[t]his Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction.)"

## III.

## FACTS COMMON TO ALL COUNTS

9. In or about February, 2011, FCE entered into an agreement with SSL and MNL, IHC companies, to offer their Limited Medical Benefits, Major Medical Benefits, and Stop Loss Insurance Benefits to FCE's clients.

10. In or about November, 2014, Defendants approached FCE, and demanded that FCE enter into revised contracts with MNL and SSL. Defendants did not provide adequate time to discuss the requested changes. Instead, they advised FCE that if the changes they demanded were not made, they would terminate the relationship with FCE. In good faith, FCE agreed to the requested changes with the understanding that Defendants intended to do business with FCE for a long period of time into the future. This understanding was based on the conversations Defendants' agents and principals were having with FCE.

11. Despite this understanding, FCE has learned that Defendants had an ulterior motive. FCE is informed and believes, and based thereon alleges that at or about the time that Defendants approached FCE to demand the new contracts, Defendants had contracted with a separate entity, Ebix, Inc. ("Ebix") to provide Defendants with a fully functional claims administration program for a set price. The program cost Ebix significantly more money to develop than it had anticipated, but Defendants only paid the contracted price.

12. FCE is informed and believes, and based thereon alleges that to recover its losses, Ebix proposed a business relationship with Defendants wherein Ebix would provide, and service, the fully functional claims administration program, as well as a profitable client base already in its possession. In exchange, Defendants would administer the claims, and the parties would share the profits. However, FCE is informed and believes, and based thereon alleges that the

business proposal included the caveat that Defendants must be exclusive with Ebix. Defendants needed to find a way to sever its relationship with FCE, which lead to Defendants' demands that FCE enter into new contracts.

13. Despite the continuing assurances from the Defendants that they wanted a long-term business relationship with FCE, the contract negotiations were one-sided in Defendants' favor, with the Defendants making various unreasonable demands, and requiring all documents to be signed by December 18, 2014, a seemingly arbitrary date, under the threat that all programs would be canceled if such deadline was not met.

14. The representations made by the Defendants to do business with FCE for a long period of time were false. The true facts were that Defendants wanted to induce FCE to continue working with Defendants through potentially profitable risk sharing Services Agreements so that Defendants could obtain FCE's client information to be used in their new business venture with Ebix. Defendants would then terminate their relationship with FCE based on claimed violations of the new and existing agreements, and move forward with their new exclusive business venture with Ebix.

15. To ensure a continued profitable relationship, and because FCE relied on MNL's and SSL's representations, to FCE's detriment, that the new contracts would enable the parties to do business together for many years into the future, on or about December 18, 2014, FCE and MNL entered into the MNL Agreement, with an effective date of September 1, 2012, for the stated purpose of growing the policies of insurance produced, managed and administered by FCE and underwritten by MNL, and in exchange, compensating FCE. A true and correct copy of the MNL Agreement is attached hereto as **Exhibit A**, and incorporated herein by reference.

16.     On or about February 12, 2015, less than two months after signing the MNL Agreement, MNL and SSL, acting through Jan Dubauskas, IHC's General Counsel and Chief Legal Officer, sent FCE a Notice of Failure to Perform, claiming that FCE had not complied with the terms of another agreement between the parties, the Amended and Restated Administrative Services Agreement (the "ASA"). In the same letter, Ms. Dubauskas notified FCE that MNL would be exiting the large group major medical market.

17.     Due to MNL exiting the large group major medical market, FCE was no longer permitted to quote MNL large group major medical products beyond February 12, 2015. Additionally, in a March 3, 2015 email, Rick Faucher, IHC's Chief Business Development Officer, clarified that due to uncertainty regarding SSL's major medical offerings, FCE could not quote SSL large group major medical products beyond June 1, 2015.

18.     Also, on February 12, 2015, despite the ongoing dispute regarding product offerings and performance, Ms. Dubauskas sent FCE a draft of an agreement with SSL, which as of February 12, 2015 had not been executed. The draft agreement with SSL contained similar terms to the MNL Agreement, including a risk sharing provision discussed more fully below.

19.     On or about March 3, 2015, after several additional revisions insisted upon by SSL and IHC, FCE and SSL entered into a Services Agreement, with an effective date of September 1, 2012 (the "SSL Agreement"), for the stated purpose of growing the policies of insurance produced, managed and administered by FCE and underwritten by SSL, and in exchange, compensating FCE. A true and correct copy of the SSL Agreement is attached hereto as **Exhibit B**, and incorporated herein by reference.

20. The MNL Agreement and SSL Agreement are substantively the same, unless otherwise specified, and will be referred to collectively as the "Agreements."[1] Additionally, the Agreements are separate and distinct from the ASA. Under paragraph 9(e) of the Agreements, the parties agreed that, "This Agreement with its Appendices and Exhibits **constitutes the entire agreement between the parties** governing the subject matter of this Agreement. This Agreement replaces any prior written or oral communications or agreements between the parties relating to the subject matter of this Agreement." (Emphasis added.)

21. Shortly after entering into the Agreements, Defendants engaged in disruptive tactics in an effort to force FCE to breach the Agreements and the ASA, and with the intent to use the alleged breaches as justification for not paying FCE under the Agreements.

22. Additionally, Defendants knew the identities of various entities with which FCE had existing and prospective relationships because of Defendants' ongoing business relationships with FCE. Defendants used their knowledge of the other entities to disparage FCE, and to interfere with existing and prospective contracts with FCE's existing and prospective clients.

23. On or about May 7, 2015, FCE received notice that MNL and SSL were exiting the business for all applicable products offered by FCE to its clients. The existing quotes would be honored, but no further quotes could be written by FCE. Additionally, the parties were to work together to honor the existing policies with FCE's clients. FCE is informed and believes and based thereon alleges that Defendants never intended to honor the existing policies. Defendants needed to completely sever their relationship with FCE under the Ebix business

---

[1] The SSL Agreement denotes Wisconsin law and venue as the appropriate forum, conflicting with the MNL Agreement, and the broader ASA, which also identifies Texas law and venue as the appropriate forum for matters not subject to arbitration. The ASA is not the subject of this matter, but shows the intent of the parties for non-arbitration matters to be tried in Texas, under Texas law.

proposal, and this was merely another effort to obtain additional FCE's confidential business information.

24. On or about May 18, 2015, Mr. Faucher demanded that FCE provide its master case list for any FCE client that utilized MNL's or SSL's products at any time, furthering FCE's suspicion that the Defendants were trying to steal its business for use by IHC Carrier and other entities associated with Defendants.

25. Just three days later, on May 21, 2015, having gained substantial information to compete directly with FCE, Defendants improperly attempted to terminate the Agreements, retroactive to December 31, 2014. Retroactive termination was not permitted under the terms of the Agreements. FCE is informed and believes and based thereon alleges that IHC attempted to terminate the Agreements retroactively after learning that its business with FCE had been profitable, and in an effort to retain all of the profits. Additionally, FCE is informed and believes and based thereon alleges that Defendants used the Agreements as an inducement and "Trojan Horse" to persuade FCE to provide Defendants with access to FCE's confidential information and trade secrets.

26. Despite the purported terminations, and in order to service the MNL and SSL products utilized by FCE's clients, Defendants continued to work with FCE, and demanded that FCE continue to provide confidential business and client information, including updated master case lists.

27. In or about May 2015, the Defendants insisted that all MNL and SSL claims be transferred to their own internal claim system. Because such a transition would be extremely disruptive, FCE requested that the claims remain in its own administration program.

28. FCE is further informed and believes, and thereon alleges that Defendants installed their personnel into FCE's processes to create further diversions in an effort to force FCE into non-compliance with the Agreements so that Defendants could attempt to justify their refusal to pay FCE under the Agreements, and to further expedite the termination of Defendants' relationship with FCE.

29. Additionally, while continuing to demand more and more information from FCE, Defendants refused to provide the financial information that FCE was entitled to under the Agreements, claiming that the Agreements were terminated.

30. From July 2015 to the present, FCE has continued to service the Defendants' existing products with FCE's clients. However Defendants have refused to provide FCE with the information it is entitled to under the Agreements, have imposed themselves into FCE's processes, have failed to pay FCE monies owed under the Agreements, and have disparaged FCE to its existing and potential clients, all resulting in damage to FCE's business, reputation and goodwill.

## IV.

## COUNT 1

### BREACH OF CONTRACT
### (Against All Defendants)

31. FCE incorporates by reference paragraphs 1 through 30 as though full set forth herein.

32. Under paragraph 2 of the Agreements, the Agreements were to be effective from September 1, 2012 through December 31, 2016, except that the Agreements shall remain in force and effect indefinitely to resolve any unsettled claims.

33. Paragraph 3(a) of the Agreements stated: "For the Contract Years 2012, 2013, 2014, 2015 and 2016 [MNL and SSL] will pay FCE forty percent (40%) of all Net Profit… earned on the limited medical, major medical and dental business within the FCE Business.[2]"

34. Under paragraph 3(c) of the Agreements, MNL and SSL "shall calculate and report to FCE the Compensation as described in 4(a) above, if any, thirty (30) days after the completion of nine (9) consecutive calendar months from the completion of the Contract Year under consideration. If such calculation results in a payment due, MNL [or SSL] shall pay FCE the amount due not later than thirty (30) days after the date of verification of said report."

35. Despite the requirements under paragraphs 3(a) and (c) of the Agreements, MNL and SSL have failed to pay FCE its share of the Net Profits. Additionally, MNL and SSL have refused to provide FCE with the information necessary to calculate Net Profits beyond 2014. To date, MNL and SSL owe FCE at least a combined $3,082,402.74 for Net Profits through 2014, plus an additional amount according to proof for 2015 and 2016.

36. FCE has fully performed its obligations under the Agreements.

37. However, since entering into the Agreements, MNL and SSL failed to pay FCE its share of the net profits, and currently owe FCE at least $3,082,402.74 combined, plus an additional amount according to proof for 2015 and 2016.

38. Accordingly, FCE seeks the full amount owed under the Agreements, plus reasonable attorney's fees, interest and costs in addition to the amounts owed under the Agreements pursuant to Texas Civil Practice and Remedies Code section 38.001.

---

[2] FCE Business is defined as the policies of insurance underwritten by MNL and SSL and produced, managed, or administered by FCE.

## V.

## COUNT 2

## FRAUD
**(Against All Defendants)**

39. FCE incorporates by reference paragraphs 1 through 38 as though full set forth herein.

40. During the formation of the Agreements, Defendants, by and through Jan Dubauskas, represented to FCE that they would comply with the terms of the Agreements, including paying the forty percent (40%) of all net profits due under paragraph 3(a).

41. The representations made by Defendants were false and misleading in that Defendants never intended to perform the terms of the Agreements, including paying FCE for the forty percent (40%) of all net profits due under paragraph 3(a) of the Agreements. Instead, FCE is informed and believes, and thereupon alleges, that Defendants merely wanted to incentivize FCE with risk sharing, and pressure FCE into unfavorable agreements and claim that FCE breached the Agreements shortly after their formation in order to gain access to FCE's confidential business information and steal FCE's business and to terminate their relationship with FCE as soon as possible.

42. Defendants knew that the representations were false and misleading at the time they made the representations.

43. Defendants made the representations to FCE intending that it would enter into the Agreements, offer policies written by MNL and SSL, and provide Defendants with FCE's client information. In reliance on the representations made by Defendants, FCE entered into the

Agreements, offered and administered policies written by MNL and SSL, and provided MNL, SSL and IHC with access to its client lists and business information.

44. In so acting, FCE was not aware of the falsity of the representations by Defendants, and reasonably believed the representations to be true.

45. As a proximate result of the fraudulent conduct of Defendants, FCE was damaged as set forth above, and in an amount to be proven at trial in excess of $50,000,000.

46. The actions of Defendants were made willfully and maliciously with intent to injure FCE. Accordingly, FCE is entitled to recover exemplary and punitive damages.

## VI.

## COUNT 3

### BUSINESS DISPARAGEMENT
### (Against All Defendants)

47. FCE incorporates by reference paragraphs 1 through 46 as though full set forth herein.

48. Since on or about 2015 to and including the present, Defendants have contacted FCE's current and prospective clients and spread false information including information regarding the accuracy of FCE's billing, the sufficiency of FCE's claims processing programs, and the overall ability of FCE to service its clients. Defendants also spread false information to FCE's vendors, carrier partners, and brokers, as well as to government agencies.

49. The disparaging statements regarding purported deficiencies in FCE's business are entirely false. The actions of Defendants as described herein are without privilege, legal justification or excuse. Defendants' baseless communications regarding FCE's claimed deficiencies to FCE's current and prospective clients, vendors, carrier partners and brokers, as

well as to government agencies, were spoken or written maliciously by Defendants for the reason that they were made with knowledge that they were false or with reckless disregard for whether they were true or false so as to indicate a conscious indifference to the rights of FCE.

50. Defendants' false representations did cause, and continue to cause, specific harm to FCE by causing clients to terminate their contracts and prospective business relationships with FCE and enter into contracts with the Defendants and others, and by causing FCE to lose goodwill with its clients.

51. Defendants made those false and disparaging representations on behalf of and in furtherance of each other's business, and Defendants have approved of, ratified and/or acquiesced in those representations and benefitted from them.

52. As the result of the above-described disparaging representations by Defendants, FCE has suffered and will continue to suffer actual damage, including damages for lost profits, and loss of past and future earning capacity in excess of $50,000,000.

53. The actions of Defendants were made willfully and maliciously with intent to injure FCE. Accordingly, FCE is entitled to recover exemplary and punitive damages.

## VII.

## COUNT 4

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

54. FCE incorporates by reference paragraphs 1 through 53 as though full set forth herein.

55. During the course of their business relationships, Defendants learned the identity of FCE's current and prospective clients. FCE's Client Contracts are typically for an initial term,

and are renewed for successive certain terms. The vast majority of FCE's clients are long-term, and regularly renew their contracts with FCE.

56. Additionally, FCE was in negotiations with various other prospective clients to begin services.

57. Defendants interfered with FCE's long-term client relationship, and prospective new client relationship, by intentionally making false or misleading representations and/or omissions to existing and prospective clients, falsely disparaging FCE and misappropriating FCE's confidential client information for the purpose of inducing the FCE Clients to terminate their ongoing, long-term, and prospective, business relationship with FCE, and enter into administrative services contracts with Defendants.

58. As a direct and proximate result of Defendants' tortious interference with FCE's prospective economic advantage, FCE has suffered and continues to suffer substantial damages in an amount according to proof.

59. Defendants' tortious interference with FCE's prospective economic advantage was done willfully and maliciously, and with the intent to injure FCE. Accordingly, FCE is entitled to recover exemplary and punitive damages.

## VIII.

## COUNT 5

### CIVIL CONSPIRACY
### (Against All Defendants)

60. FCE incorporates by reference paragraphs 1 through 59 as though full set forth herein.

61. Defendants have conspired together to tortiously interfere with the Client Contracts and the contracts between FCE and its vendors, carrier partners and brokers. Defendants have also conspired together to tortuously interfere with FCE's prospective business advantages with the FCE Clients, vendors, carrier partners, and brokers, and to disparage FCE, and misappropriate FCE's business.

62. As a direct and proximate result of Defendants' civil conspiracy, FCE has suffered and continues to suffer substantial damages, in an amount according to proof.

63. Defendants have engaged in the civil conspiracy willfully and maliciously with the intent to injure FCE. Accordingly, FCE is entitled to recover exemplary and punitive damages.

## IX.

## COUNT 6

### PRELIMINARY AND PERMANENT INJUNCTION
### (Against All Defendants)

64. FCE incorporates by reference paragraphs 1 through 63 as though full set forth herein.

65. Defendants' breaches of contract and tortious conduct have damaged FCE, and unless restrained by this Court, will continue to cause damage to FCE and undermine, if not

destroy, the value of its contract rights, business relationships, confidential information, business reputation, and/or goodwill.

66. Unless Defendants are enjoined, FCE will suffer severe losses, and may also suffer a substantial diminution and eventual potential loss of the entire value of its business.

67. FCE has no adequate remedy at law in that (a) it will be impossible for FCE or the Court to determine the precise amount of damages that FCE has suffered and will continue to suffer; (b) it will be impossible for FCE to overcome the harm to its standing and reputation; and, (c) it will be impossible for FCE to regain its existing business opportunities and prospective income and profits if the wrongful and tortious conduct of Defendants is not restrained.

WHEREFORE, FCE prays for judgment against Defendants, jointly and severally, as follows:

    a. Net Profits contractually owed to FCE under the Agreements in the combined amount of at least $3,082,402.74 through 2014, plus an additional amount according to proof for 2015 and 2016;

    b. Actual damages as proved at trial on all Counts of the Complaint in an amount exceeding $50,000,000;

    c. Statutory damages as allowed by law;

    d. That Defendants, and their respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, or in concert therewith, be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid conspiracy, and from adopting or following any practice, plan, program or design having similar purpose or effect;

 e. That Defendants, and their respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, or in concert therewith, be perpetually enjoined and restrained from in any manner engaging in the aforesaid tortious conduct;

 f. Exemplary and punitive damages as allowed by law;

 g. FCE's costs of suit;

 h. Reasonable and necessary attorney's fees as may be determined by this Court;

 i. Prejudgment interest on all amounts owed; and,

 j. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ L. Kimberly Steele
MARIA K. KAROS
State Bar No. 11101280
maria.karos@sedgwicklaw.com
L. KIMBERLY STEELE
State Bar No. 014127600
kimberly.steele@sedgwicklaw.com

**SEDGWICK LLP**
2323 Ross Avenue, Suite 750
Dallas, Texas 75201
(469) 227-8200   (Telephone)
(469) 227-8004   (Facsimile)

**ATTORNEYS FOR PLAINTIFF**
**FCE BENEFIT ADMINISTRATORS, INC.**

## CERTIFICATE OF SERVICE

On August 18, 2017, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


                                      */s/ L. Kimberly Steele*
                                      L. KIMBERLY STEELE