# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| FCE BENEFIT ADMINISTRATORS, INC. | § § § | |
| v. | § | CIVIL ACTION NO. 3:17-CV-1321-S |
| | § | |
| INDEPENDENCE HOLDING COMPANY, et al. | § § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants Independence Holding Company ("IHC"), Madison National Life Insurance Company, Inc. ("MNL"), Standard Security Life Insurance Company of New York ("SSL"), and IHC Carrier Solutions, Inc.'s ("IHC Carrier") (collectively, "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") [ECF No. 42]. For the following reasons, the Court grants in part and denies in part the Motion.

### I. BACKGROUND

In February 2011, Plaintiff FCE Benefit Administrators, Inc. ("Plaintiff") entered into an agreement with SSL and MNL, under which Plaintiff offered SSL's and MNL's insurance benefits programs to its clients. FAC ¶ 9. In November 2014, Defendants approached Plaintiff, and requested that Plaintiff enter into revised contracts with SSL and MNL. *Id.* ¶ 10. Plaintiff claims it agreed to the changes, largely due to Defendants' assurances of a continuing business relationship. *See id.* ¶¶ 10, 13-14. Accordingly, Plaintiff entered into contracts with MNL ("MNL Agreement") and SSL ("SSL Agreement") (collectively, "Agreements") on December 18, 2014, and March 3, 2015, respectively. *Id.* ¶¶ 15, 19. Those Agreements are substantively the same, and were executed for the stated purpose of growing the policies of the insurance produced, managed, and administered by Plaintiff and underwritten by MNL and SSL. *Id.* ¶¶ 15, 20. In

exchange, Defendants would compensate Plaintiff "[f]or the Contract Years" 2012 to 2016 at "forty percent (40%) of all Net Profit . . . earned on the limited medical, major medical and dental business within the FCE Business." *Id.* Ex. A at 2; *id.* Ex. B at 2. "Net Profit" is calculated as follows:

> c. The Net Profit or Net Loss of each Contract Year shall be calculated in accordance with the following formula, it being understood that INCOME shall be the amount identified in subparagraph 1. below, and OUTGO shall be the sum of the amounts identified in subparagraphs 2., 3., 4., 5., and 6. below:
>
> **INCOME**
> 1. Gross earned Premium received by [MNL and SSL] for losses occurring during the Contract Year under consideration, reduced by the rebates paid as determined by [MNL's and SSL's] actuaries, in accordance with the regulations promulgated under the Patient Protection and Affordable Care Act (and related amendments and regulations) ("PPACA").
>
> **OUTGO**
> 2. Losses incurred and paid plus reserves for losses incurred and not yet paid as established by [MNL and SSL] for losses occurring during the Contract Year under consideration ("Outgo 2");
> 3. An additional 20% reserve margin will apply to the best estimate reserves in all calculations ("Outgo 3");
> 4. Carrier fees, commissions, excess reinsurance fees (see Exhibit C), risk adjusters, administration expenses, actuarial fees, PPACA taxes, fees and expenses, medical loss ratio rebates under PPACA calculation in accordance with Paragraph 5 and related expenses payable by MNL for the Business, as defined by MNL and used in pricing for the Business ("Outgo 4");
> 5. Federal and state: premium taxes, licenses, fees and assessments during the Contract Year ("Outgo 5").
>
> The amount by which INCOME exceeds OUTGO is the Net Profit. The amount by which OUTGO exceeds INCOME is the Net Loss.

*Id.* Ex. A at 2; *id.* Ex. B at 2. On December 18, 2014, Plaintiff entered into a separate contract with MNL and SSL—the Amended and Restated Administrative Services Agreement ("ASA"). Defs. App. 84. The ASA contains the following arbitration provision:

2

**18. ARBITRATION**

(a) In the event of any dispute between the parties which arises under [the ASA] . . . shall be settled by arbitration in accordance with the rules for commercial arbitration of the American Arbitration Association (or a similar organization) in effect at the time such arbitration is initiated, in the manner set forth below.

*Id.* at 75-76.

Plaintiff alleges that shortly after entering into the Agreements and the ASA, "Defendants engaged in disruptive tactics in an effort to force [Plaintiff] to breach the Agreements and the ASA, and with the intent to use the alleged breaches as justification for not paying [Plaintiff] under the Agreements." FAC ¶ 21. Plaintiff further alleges that because of their ongoing business relationship, "Defendants knew the identities of various entities with which [Plaintiff] had existing and prospective relationships." *Id.* ¶ 22. Defendants allegedly used this knowledge to disparage Plaintiff and "interfere with [Plaintiff's] existing and prospective contracts with [its] existing clients." *Id.*

On August 18, 2017, Plaintiff filed its FAC, asserting claims for breach of contract, fraud, business disparagement, tortious interference with prospective economic advantage, civil conspiracy, and requesting a preliminary and permanent injunction. On April 15, 2019, Defendants filed the pending Motion.

## II. ANALYSIS

### A. *Rule 12(b)(6) Motion to Dismiss Count I*

In Count I, Plaintiff asserts a breach-of-contract claim, alleging that Defendants have breached the Agreements by refusing to compensate Plaintiff. Defendants argue that this claim fails as a matter of law because the Agreements are illegal and unenforceable under both the Texas Insurance Code and the Employee Retirement Income Security Act ("ERISA"). *See* Br. in Supp. of Defs.' Mot. to Dismiss ("Mot.") 8-13.

3

Illegality of a contract is an affirmative defense under both Texas and federal law. *See Komet v. Graves*, 40 S.W.3d 596, 602 (Tex. App.—San Antonio 2001, no pet.) (citing TEX. R. CIV. P. 94); *see also Coury v. Prot*, 85 F.3d 244, 255 (5th Cir. 1996). "To obtain a Rule 12(b)(6) dismissal based on an affirmative defense, the 'successful affirmative defense [must] appear[] clearly on the face of the pleadings.'" *Ginsburg*, 2017 WL 5467688, at *4 (alteration in original) (quoting *Cochran v. Astrue*, Civ. A. No. 3:11-CV-1257-D, 2011 WL 5604024, at *1 (N.D. Tex. Nov. 17, 2011)). "In other words, defendants are not entitled to dismissal under Rule 12(b)(6) based on an affirmative defense unless [Plaintiff] 'has pleaded [it]self out of court by admitting to all of the elements of the defense.'" *Id.* (quoting *Cochran*, 2011 WL 5604024, at *1).

### (1) *Illegality under the Texas Insurance Code*

#### a. *The SSL Agreement*

"[Q]uestions involving the effect of illegality upon a contract are determined by the law chosen by the parties, if they have made an effective choice." *Ginsburg v. ICC Holdings, LLC*, Civ. A. No. 3:16-CV-2311-D, 2017 WL 5467688, at *4 (N.D. Tex. Nov. 13, 2017) (quoting Restatement (Second) of Conflicts of Law § 202 cmt. a (1971)). The parties ask the Court to apply Texas law to both Agreements. *See* Mot. 9; FAC 7 n.1. Although there are some instances where parties can stipulate to the substantive law to be applied to their dispute, *see Holloway v. HECI Expl. Co. Emps.' Profit Sharing Plan*, 76 B.R. 563, 572 (N.D. Tex. 1987), the Court is not bound to follow any such stipulation. *ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 65 (S.D. Tex. 2007) (citing *Ezell v. Hayes Oilfield Constr. Co., Inc.*, 693 F.2d 489, 492 n.2 (5th Cir. 1982)).

Here, the SSL Agreement states that it is governed by Wisconsin law. See FAC Ex. B at 6. Because the "contract sets forth a choice of law provision and the parties to the contract do not dispute its validity," the Court declines to apply Texas law to the SSL Agreement. *Crowngate Assocs., LLC v. Wachovia Bank, Nat'l Ass'n*, Civ. A. No. H-08-2064, 2008 WL 11389017, at *2

4

(S.D. Tex. Oct. 30, 2008). Defendants do not argue that the SSL Agreement is illegal under Wisconsin law. Therefore, the Court denies Defendants' Motion to Dismiss the SSL Agreement pursuant to FED. R. CIV. P. 12(b)(6).

### b. *The MNL Agreement*

Texas law applies to the MNL Agreement, *see* FAC Ex. A at 6, and Defendants argue that it is illegal and unenforceable because it violates Texas Insurance Code § 4151.117(b). *See Jack v. State*, 694 S.W.2d 391, 397 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) ("A contract which is made in violation of a statute is illegal and void . . . ."); *see also Peniche v. Aeromexico*, 580 S.W.2d 152 (Tex. App.—Houston [1st Dist.] 1979, no pet.) ("A contract to do a thing which cannot be performed without a violation of the law is void . . . ." (quoting *Tex. Emp'rs' Ins. Ass'n v. Tabor*, 283 S.W. 779, 780 (Tex. Comm. App. 1926)).

Texas Insurance Code § 4151.117(b) reads as follows:

> (b) An insurer or plan sponsor may not permit or provide compensation or another thing of value to an administrator that is based on the savings accruing to the insurer or plan sponsor because of adverse determinations regarding claims for benefits, reductions of or limitations on benefits, or other analogous actions inconsistent with this chapter, that are made or taken by the administrator.

Defendants contend that the compensation formula in the MNL Agreement plainly violates this subsection, Mot. 10; *see also* Reply Br. in Supp. of Defs. Mot. to Dismiss ("Reply") 3-5, as Plaintiff is compensated under the MNL Agreement based on "Net Profit." FAC Ex. A at 2. "Net Profit" is defined as "INCOME" minus "OUTGO." *Id.* "OUTGO" includes "[l]osses incurred and paid," which, in turn, includes all claims that Plaintiff approved for payment. *Id.* Therefore, by denying clams, Plaintiff ultimately increases the "Net Profit." *See* Mot. 10. According to Defendants, since Plaintiff is paid based on "Net Profit," the MNL Agreement is illegal because it "permit[s] . . . compensation . . . based on the savings accruing to the insurer or plan sponsor

5

because of adverse determinations regarding claims for benefits . . . ." TEX. INS. CODE ANN. § 4151.117(b); *see also* Mot. 10.

Defendants' logic, however, does not account for the fact that Section 4151.002(5) exempts licensed agents from the TPA requirements set forth in Chapter 4151. *Cf. Koenig v. Aetna Life Ins.*, No. 4:13-CV-00359, 2015 WL 6473351, at *8 (S.D. Tex. Oct. 25, 2015).

Section 4151.002(5) reads, in relevant part, as follows:

A person is not an administrator if the person is:

\* \* \*

(5) an agent licensed under Subchapter B, Chapter 4051, Subchapter B, Chapter 4053, or Subchapter B, Chapter 5054, who receives commissions as an agent and is acting:

> (A) under appointment on behalf of an insurer authorized to engage in the business of insurance in this state; and
>
> (B) in the customary scope and duties of the person's authority as an agent.

Although Plaintiff "is a [TPA] that enters into contracts in the course and scope of its business with various insurance providers, including the defendants in this action," Compl. ¶ 1, Defendants have not identified, and the Court has not found, any authority to indicate that a business entity cannot perform the duties of either a TPA or an agent, depending on the circumstances. Here, the MNL Agreement does not refer to Plaintiff as a TPA, and it appears to require Plaintiff to perform duties that are outside the scope of a TPA. *See* FAC Ex. A. Section 4151.001(1) defines a TPA as "a person who, in connection with annuities or life benefits, health benefits, accident benefits, pharmacy benefits, or workers' compensation benefits, collects premiums or contributions from or adjusts or settles claims for residents of this state." The MNL Agreement provides that Plaintiff "produces, manages and administers certain policies of insurance underwritten by MNL." FAC Ex. A at 1. The "produc[tion]" and "manage[ment]" of

6

the policies—duties that are not contemplated by the definition of TPA—may have been duties performed in Plaintiff's agency capacity, rather than Plaintiff's TPA capacity.

Therefore, viewing the Complaint in the light most favorable to the Plaintiff, it is not "clear[] on the face of the pleadings" that the MNL Agreement is illegal because it violates TEX. INS. CODE ANN. § 4151.117. *Ginsburg*, 2017 WL 5467688, at *4 (quoting *Cochran*, 2011 WL 5604024, at *1). Specifically, the Complaint does not aver that the MNL Agreement is a TPA agreement rather than an agency agreement. *See generally* Compl. Since agency agreements are not subject to Chapter 4151's requirements, Defendants are not entitled to dismissal of Count I based on the affirmative defense of illegality under to the Texas Insurance Code. *See Ginsburg*, 2017 WL 5467688, at *4. ("[D]efendants are not entitled to dismissal under Rule 12(b)(6) based on an affirmative defense unless [Plaintiff] 'has pleaded [it]self out of court by admitting to all of the elements of the defense.'").

### (2) *ERISA*

Defendants also argue that the Agreements are illegal under § 1104 of ERISA, 29 U.S.C. § 1001 et seq. As ERISA is a federal statute, the Court applies federal law to determine whether the Agreements are illegal. *Id.* (citing, among other authorities, *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959)). "Under federal law, contracts that violate a federal statute on their face are 'intrinsically illegal.'" *Id.* at *7 (quoting *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986)). "To determine whether a contract violates a federal statute on its face, [the court] compare[s] the four corners of the contract within the language of the statute and related regulations and any interpreting case law." *Id.* (quoting *Energy Labs, Inc. v. Edwards Eng'g, Inc*, No. 14 C 7444, 2015 WL 3504974, at *4 (N.D. Ill. June 2, 2015)). "'In addition, even if the contract is not illegal on its face, courts have found contracts inherently illegal where one

party must violate a statute or regulation to fulfill its obligations.'" *Id.* (quoting *Energy Labs*, 2015 WL 3504974, at *3).

Defendants argue the Agreements violate § 1104 of ERISA because Plaintiff is a fiduciary, and the Agreements, if enforced, "would clearly violate ERISA's requirements that the claims administrator act as a fiduciary, because every claim determination would be colored by its effect upon [Plaintiff's] income." Mot. 13. That section reads, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . and defraying reasonable expenses of administering the plan . . . ."

29 U.S.C. § 1104(a)(1).

The Court finds that Defendants have shown neither that the Agreements facially violate ERISA, nor that Plaintiff could not fulfill the Agreements' obligations without violating ERISA. "To establish breach of fiduciary duty under ERISA, a plaintiff must prove a breach of fiduciary duty and a prima-facie case of loss to the plan." *Ehlmann v. Kaiser Found. Health Plan*, 20 F. Supp. 2d 1008, 1011 (citing *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996)). Here, the Agreements do not violate ERISA, as nothing in the Agreements requires Plaintiff to breach any fiduciary duty it may have. Moreover, it is unclear whether § 1104 applies to Plaintiff, as the Complaint does not admit that Plaintiff (1) is a fiduciary under ERISA and (2) breached its fiduciary duties. *See id.* ("[D]efendants are not entitled to dismissal under Rule 12(b)(6) based on an affirmative defense unless [Plaintiff] 'has pleaded [it]self out of court by admitting to all of the elements of the defense.'") *Id.* Therefore, it is not "clear[] on the face of the pleadings" that the Agreements are illegal because they violate ERISA. *Ginsburg*, 2017 WL 5467688, at *4 (quoting *Cochran*, 2011 WL 5604024, at *1). Consequently, the Court denies Defendants' Motion to Dismiss Count I.

## B. *Rule 12(b)(1) or Rule 12(b)(3) Motion to Dismiss Counts II-VI*

Defendants move to compel Plaintiff's remaining claims to arbitration. Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, written arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Here, the parties do not dispute the applicability of the FAA, which provides that a party seeking to enforce an arbitration provision may petition the court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* § 4.

Enforcement of an arbitration agreement involves two analytical steps. *See Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The first is contract formation—whether the parties entered into any arbitration agreement at all. *Id.* The second involves contract interpretation to determine whether the claim at issue is covered by the arbitration agreement. *Id.* Ordinarily, both steps are questions for the Court. *Id.* (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). "But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). Here, the parties do not dispute that they entered into an arbitration agreement. *See* Mot. 14; *see also* Resp. 18.

With respect to the second step of the analysis, the parties are free to delegate questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself. *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 551 (5th Cir. 2018) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010)). Courts, however, may not assume that parties have agreed to arbitrate threshold issues absent clear and unmistakable evidence of their intent to do so. *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)). The Fifth Circuit has held that a stipulation among parties that the Commercial Arbitration Rules of the American

Arbitration Association ("AAA Rules") will govern the arbitration of disputes generally constitutes such "clear and unmistakable" evidence. *Id.* (citing *Petrofac, Inc. v. Dyn-McDermott Petroleum Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012)). The AAA Rules state, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AM. ARBITRATION ASS'N, COMMERCIAL ARBITRATION RULES & MEDIATION PROC. R-7(a) (2013), https://www.adr.org/rules.

Here, the arbitration clause in the ASA explicitly stipulates that the AAA Rules will govern the arbitration of disputes:

> (a) In the event of any dispute between the parties which arises under [the ASA] . . . ***shall be settled by arbitration in accordance with the rules for commercial arbitration of the American Arbitration Association*** (or a similar organization) in effect at the time such arbitration is initiated, in the manner set forth below.

Defs. App. 75-76 (emphasis added). Accordingly, the Court finds that there is clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability and scope to the arbitrator. *See Petrofac*, 687 F.3d at 674-75. Therefore, it is for the arbitrator to decide threshold questions, including whether the arbitration clause encompasses Plaintiff's extra-contractual claims.

### III.  CONCLUSION

For the reasons discussed above, the Court grants in part and denies in part Defendants' Motion to Dismiss. Defendants' Motion to Dismiss Count I pursuant to Fed. R. Civ. P. 12(b)(6) is denied. Defendants' Motion to Dismiss Counts II-VI is granted in part. The Court finds that an arbitration agreement, including an arbitration provision, exists between Plaintiff and Defendants. The arbitration provision incorporates the AAA Rules, evincing clear and unmistakable evidence of the parties' intent to have the arbitrator decide whether a given claim must be arbitrated. Any

10

challenges to the enforceability or scope of the arbitration clause must be decided by the arbitrator. Counts II-VI are therefore dismissed, without prejudice. *See Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (dismissal proper where all issues raised in district court must be submitted to arbitration). The parties are directed to proceed with arbitration in accordance with the rules for commercial arbitration of the American Arbitration Association (or a similar organization).

**SO ORDERED.**

SIGNED October 16, 2019.

_____
**KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE**